# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

FEDERAL TRADE COMMISSION,

                Plaintiff,

   v.

FIRST CHOICE HORIZON LLC, a Florida
limited liability company,

FIRST SOUTHERN TRUST LLC, a Florida
limited liability company,

FIRST UNITED MUTUAL LLC, a Florida
limited liability company,

PREMIER UNION TRUST LLC, also dba
SECOND CHOICE HORIZON, a Florida limited
liability company,

SOUTH PREMIER TRUST LLC, a Florida
limited liability company,

SUNCOAST MUTUAL LLC, a Florida limited
liability company,

UNITED CHOICE PLUS LLC, a Florida limited
liability company,

SOUTHERN CHOICE LLC, a Florida limited
liability company,

SOUTHERN PRIDE LLC, a Florida limited
liability company,

SUN PREMIER LLC, a Florida limited liability
company,

FINANCIAL SERVICE TRUST LLC, a Florida
limited liability company,

Case No. 6:19-cv-01025-PGB-LRH

**FIRST AMENDED COMPLAINT
FOR PERMANENT INJUNCTION
AND OTHER EQUITABLE RELIEF**

1

RAYMOND GONZALEZ, individually and as a
member, manager, or owner of FIRST CHOICE
HORIZON LLC,

CARLOS S. GUERRERO, a/k/a Carlos Sinencio
Guerrero, also dba CSG SOLUTIONS,
individually, and as an officer, member, manager,
or owner of FIRST CHOICE HORIZON LLC
and FIRST UNITED MUTUAL LLC, and

JOSHUA HERNANDEZ, individually, and as a
member, manager, or owner of SOUTH
PREMIER TRUST LLC,

                    Defendants.

Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:

1.      The FTC brings this action under Sections 13(b) and 19 of the Federal Trade

Commission Act ("FTC Act"), 15 U.S.C. § 53(b) and 57b, and the Telemarketing and

Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. §§ 6101-6108,

to obtain temporary, preliminary, and permanent injunctive relief, rescission or reformation

of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and

other equitable relief for Defendants' acts or practices in violation of Section 5(a) of the FTC

Act, 15 U.S.C. § 45(a), and in violation of the FTC's Telemarketing Sales Rule ("TSR"), 16

C.F.R. Part 310.

## SUMMARY OF THE CASE

2.      Since at least May 2016, the Individual Defendants Raymond Gonzalez,

Carlos S. Guerrero, and Joshua Hernandez, through a maze of eleven interrelated companies

called First Choice Horizon LLC, First Southern Trust LLC, First United Mutual LLC,

Premier Union Trust LLC, South Premier Trust LLC, Suncoast Mutual LLC, United Choice Plus LLC, Southern Choice LLC, Southern Pride LLC, Sun Premier LLC, and Financial Service Trust LLC (the "Corporate Defendants" and collectively "Defendants"), have engaged in a telemarketing scheme that defrauds financially distressed consumers by selling a bogus credit card interest rate reduction service ("Defendants' service" or "service"). Under the names "CSG Solutions" and "Second Choice Horizon," Defendants sell their service by making deceptive guarantees that, for a fee, they will lower consumers' credit card interest rates to zero percent for the life of their credit card debt and thereby save the consumers thousands of dollars.

3.     As part of this campaign, Defendants have initiated, or directed others to initiate, illegal telephone calls to consumers throughout the United States, including many consumers whose telephone numbers appear in the Do Not Call registry maintained by the FTC (the "National Do Not Call Registry" or "Registry").  Many of Defendants' calls deliver a prerecorded message, also known as a "robocall," which instructs consumers to "press 1" if they are interested in lowering their credit card interest rates.  Consumers who press "1" on their telephone keypad are connected to a live telemarketer who gives Defendants' sales pitch for their service.

4.     During this telemarketing call, often under the guise of confirming the consumers' identity, Defendants ask consumers to provide personal financial information such as their social security number, and their credit card numbers and security codes.

5.     Although, in many instances, Defendants tell consumers that they are charging a fee for their service, Defendants do not disclose that their service may result in consumers

3

paying additional bank or transaction fees, such as balance transfer fees that can typically total three to five percent of the amount of a consumer's credit card debt.

6.      Consumers who agree to use Defendants' service do not receive what they are promised.  While, in some instances, Defendants are able to secure new credit cards for consumers at a zero percent interest, this rate is not for the life of the consumer's debt, but rather only a promotional "teaser" interest rate that only lasts for a limited time period, after which the interest rate increases significantly.  Defendants' tactics almost never result in consumers obtaining a zero percent interest rate that is permanent.  Further, consumers typically do not save thousands of dollars on their credit card debt by using Defendants' service, especially after they are required to pay Defendants' often substantial fee in addition to any bank or transaction fees, such as balance transfer fees.

7.      In numerous instances, consumers who do not agree to use Defendants' service discover that, after their telemarketing call was concluded, Defendants have applied for one or more credit cards on behalf of the consumers without the consumers' knowledge, authorization, or express informed consent.  Thereafter, these consumers often receive an invoice and/or calls from Defendants to pay the fee for Defendants' unordered and unwanted service.

8.      Corporate Defendants have operated as a common enterprise while engaging in these deceptive or unfair acts.  These integrated entities operate under common control, share staff, locations, telephone numbers, business expenses, and commingle funds.

**JURISDICTION AND VENUE**

9.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331,

4

1337(a), and 1345.

10.     Venue is proper in this district under 28 U.S.C. § 1391(b)(1) & (2) and 15 U.S.C. § 53(b).

## PLAINTIFF

11.     The FTC is an independent agency of the United States Government created by statute.  15 U.S.C. §§ 41-58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.  The FTC also enforces the Telemarketing Act, 15 U.S.C. §§ 6101-6108.  Pursuant to the Telemarketing Act, the FTC promulgated and enforces the TSR, 16 C.F.R. Part 310, which prohibits deceptive and abusive telemarketing acts or practices in or affecting commerce.

12.     The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act and the TSR and to secure such relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, the disgorgement of ill-gotten monies, and other relief.  15 U.S.C. §§ 53(b), 56(a)(2)(A)-(B), 57b, 6102(c), and 6105(b).

## DEFENDANTS

13.     Defendant First Choice Horizon LLC is a Florida limited liability company with its principal place of business at 3929 Pemberly Pines Circle, Saint Cloud, Florida 34769.  First Choice Horizon transacts or has transacted business in this district and throughout the United States.

14.     Defendant First Southern Trust LLC is a Florida limited liability company with its principal place of business at 8529 South Park Circle, Orlando, Florida 32819.  First

Southern Trust transacts or has transacted business in this district and throughout the United States.

15.     Defendant First United Mutual LLC is a Florida limited liability company with its principal place of business at 6900 South Orange Blossom Trail, Orlando, Florida 32809.  First United Mutual transacts or has transacted business in this district and throughout the United States.

16.     Defendant Premier Union Trust LLC, also dba Second Choice Horizon, is a Florida limited liability company with its principal place of business at 1341 Raintree Bend, Clermont, Florida 34714.  Premier Union Trust transacts or has transacted business in this district and throughout the United States.

17.     Defendant South Premier Trust LLC is a Florida limited liability company with its principal place of business at 296 E Michigan Street, Orlando, Florida 32806.  South Premier Trust transacts or has transacted business in this district and throughout the United States.

18.     Defendant Suncoast Mutual LLC is a Florida limited liability company with its principal place of business at 1000 Legion Place, Orlando, Florida 32801.  Suncoast Mutual transacts or has transacted business in this district and throughout the United States.

19.     Defendant United Choice Plus LLC is a Florida limited liability company with its principal place of business at 12001 Research Parkway, Suite 236, Orlando, FL 32826. United Choice Plus transacts or has transacted business in this district and throughout the United States.

20.     Defendant Southern Choice LLC is a Florida limited liability company with

6

its principal place of business at 121 S. Orange Avenue, Orlando, FL 32801.  Southern Choice transacts or has transacted business in this district and throughout the United States.

21.     Defendant Southern Pride LLC is a Florida limited liability company with its principal place of business at 3929 Pemberly Pines Circle, Saint Cloud, FL 34770.  Southern Pride transacts or has transacted business in this district and throughout the United States.[1]

22.     Defendant Sun Premier LLC is a Florida limited liability company with its principal place of business at 933 Lee Road, Orlando, FL 32810.  Sun Premier transacts or has transacted business in this district and throughout the United States.

23.     Defendant Financial Service Trust LLC is a Florida limited liability company with its principal place of business at 1400 West Oak Street G, Kissimmee, FL 34741. Financial Service Trust transacts or has transacted business in this district and throughout the United States.

24.     Defendant Raymond Gonzalez is a member, manager, or owner of First Choice Horizon LLC.  At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint.  Defendant Raymond Gonzalez resides in this district and, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

25.     Defendant Carlos S. Guerrero is or has been an officer, member, manager, or owner of the Corporate Defendants First Choice Horizon LLC and First United Mutual LLC.

---

[1] According to the Florida Secretary of State, Southern Pride filed for voluntary dissolution on April 17, 2019.

He also holds the registration for the Florida fictitious name "CSG Solutions."  At all times

material to this Complaint, acting alone or in concert with others, he has formulated, directed,

controlled, had the authority to control, or participated in the acts and practices set forth in

this Complaint.  Defendant Guerrero resides in this district and, in connection with the

matters alleged herein, transacts or has transacted business in this district and throughout the

United States.

26.     Defendant Joshua Hernandez is a member, manager, or owner of South

Premier Trust LLC.  At all times material to this Complaint, acting alone or in concert with

others, he has formulated, directed, controlled, had the authority to control, or participated in

the acts and practices set forth in this Complaint.  Defendant Hernandez resides in this

district and, in connection with the matters alleged herein, transacts or has transacted

business in this district and throughout the United States.

## COMMON ENTERPRISE

27.     The Corporate Defendants have operated as a common enterprise while

engaging in the deceptive or unfair acts and practices, and other violations of law alleged

herein.  Corporate Defendants are integrated entities operating under common control,

sharing staff, telephone numbers, business expenses, and mailing locations.  The Corporate

Defendants also commingle funds – moving money between their numerous accounts and

ultimately delivering millions of dollars in profits from the enterprise to the Individual

Defendants.  Because Corporate Defendants have operated as a common enterprise, each of

them is jointly and severally liable for the acts and practices alleged below.  The Individual

Defendants have formulated, directed, controlled, had the authority to control, or participated

in the acts and practices of Corporate Defendants that constitute the common enterprise.

## COMMERCE

28.     At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS PRACTICES

29.     Since at least May 2016, Defendants have engaged in a plan, program, or campaign to market, promote, offer for sale, or sell their credit card rate reduction service through interstate telephone calls to consumers throughout the United States.

30.     Defendants induce the sale of their service by making numerous material misrepresentations, including, but not limited to, that Defendants will lower consumers' credit card interest rates permanently to zero percent and save the consumers thousands of dollars on their credit card debt.

31.     Defendants charge a substantial fee for their service, which can generally range from $200 to $8,000.

32.     Defendants instruct consumers to pay the fee for their service to one of the Corporate Defendants by authorizing remotely created checks, taking a cash advance against their credit cards, or by sending a money order, or a personal, bank, or credit card check by mail to post office boxes located in the Orlando, Florida area.

33.     Consumers who agree to use Defendants' service rarely get the service promised by Defendants during their telemarketing call, and Defendants, in most instances, do not refund the consumers' payment.

9

34.     In numerous instances, consumers who refuse the offer of Defendants' service during their telemarketing call nonetheless receive unordered and unwanted (a) credit cards and credit card applications, and (b) invoices and/or calls for payment of the fee for Defendants' service.

## Defendants' Telemarketing Campaign

35.     In numerous instances, Defendants have initiated, or directed others to initiate, telemarketing calls to consumers that deliver a prerecorded message offering consumers the opportunity to lower their credit card interest rates if they press a number on their telephone keypad.  When consumers press the number on their telephone keypad, they are connected to a live representative.

36.     In other instances, Defendants have initiated, or directed others to initiate, telemarketing calls to consumers in which a live representative offers consumers the opportunity to lower their credit card interest rates to zero.

37.     Once a consumer is connected with a live telemarketer, Defendants do not initially disclose their company name, but rather often use a name like "card member services" and frequently deceive consumers into thinking that Defendants have a relationship or affiliation with the consumer's bank or credit card issuer.

38.     Defendants also deceive consumers into disclosing their personal financial information, such as their social security number, and their credit card numbers and security codes, to Defendants under the guise that Defendants must confirm the consumers' identity.

39.     During telemarketing calls, Defendants represent that they offer a service that

will permanently reduce consumers' credit card interest rates to zero percent.

40. During telemarketing calls, Defendants often claim that their service will allow consumers to save thousands of dollars on their credit card debt.

41. During telemarketing calls, Defendants often tell consumers that they will be charged a fee for Defendants' service typically ranging from $200 to $8,000.

42. Defendants fail to inform consumers that consumers will likely have to pay additional fees to obtain the zero percent interest rates.

*Defendants' Deceptive Telemarketing Sales Pitch*

43. Later in the telephone calls, Defendants inform consumers that they do not contact consumers' current credit card companies to obtain a zero percent credit card interest rate, but rather, Defendants obtain new credit cards that have a zero percent introductory "teaser" interest rate ("promotional rate"), and then have the consumers transfer their existing credit card balances to those new cards.

44. As part of this process, consumers often pay a three to five percent balance transfer fee to move their existing credit card balances to the promotional rate credit cards.

45. Defendants do not disclose the balance transfer fees to consumers.

46. The promotional rate credit cards that Defendants obtain for consumers rarely, if ever, result in a consumer obtaining a permanent zero percent interest rate. In most cases, the interest rates on these credit cards increase significantly at the end of the limited promotional term.

47. Defendants frequently send consumers an invoice and/or call consumers demanding payment of the fee for their service. Consumers who pay Defendants' service fee

and transfer their credit card balances to the promotional rate cards obtained for consumers

by Defendants, rarely, if ever, save thousands of dollars on their credit card debt.

48.     Defendants' claim that they will obtain permanent, zero percent credit card

interest rates for consumers is false and deceptive.

49.     Defendants' claim that, by using their service, consumers will save thousands

of dollars on their credit card debt is false and deceptive.

*Post Solicitation Deceptive and Unfair Practices*

50.     After hearing Defendants' telemarketing sales pitch, many consumers refuse

Defendants' offer for their service.  Despite this refusal, Defendants use the consumers'

personal financial information obtained during the sales call, and apply for one or more credit

cards on behalf of these consumers without the consumers' knowledge, authorization, or

express informed consent.

51.     Thereafter, Defendants frequently send these consumers an invoice and/or call

consumers demanding payment of the fee for their service.

52.     In many instances, consumers dispute that they ordered Defendants' service.

Defendants, nonetheless, claim that these consumers verbally ordered Defendants' service,

that Defendants already obtained new credit cards for these consumers, and that the

consumers owe money to Defendants for their service.

53.     While, in some instances, Defendants claim to have an audio recording of the

sales call in which the order was purportedly placed, Defendants ignore any consumer

requests to hear the recording.

54.     In numerous instances, consumers refuse to pay Defendants' fee for a service

they did not order and did not want.  When consumers refuse to pay, Defendants often attempt to coerce them by making repeated calls to these consumers demanding payment.

55.     In numerous instances, Defendants' claim that consumers have ordered Defendants' service and that consumers owe money to Defendants for their service is false and deceptive.

56.     Defendants' practice of applying for one or more credit cards for consumers without the consumers' knowledge, authorization, or express informed consent is an unfair act or practice.

### *Defendants' Illegal Telemarketing Practices*

57.     Defendants, acting directly or through one or more intermediaries, have made numerous outbound calls to telephone numbers on the National Do Not Call Registry to sell their service.

58.     In numerous instances, Defendants, acting directly or through one or more intermediaries, have initiated outbound telemarketing calls to consumers that delivered a prerecorded message to sell their service.

59.     In numerous instances, Defendants, acting directly or through one or more intermediaries, have initiated outbound telemarketing calls to telephone numbers in various area codes without first paying the annual fee for access to the telephone numbers within such area codes that are included in the National Do Not Call Registry.

60.      In numerous instances, Defendants require consumers to pay their service fee from consumers' bank accounts by authorizing remotely created checks, a payment method which is prohibited in connection with the telemarketing of goods or services.

## **VIOLATIONS OF THE FEDERAL TRADE COMMISSION ACT**

61.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

62.     Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.  15 U.S.C. § 45(a).

63.     Acts or practices are unfair under Section 5 of the FTC Act if they cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition. 15 U.S.C. § 45(n).

## **COUNT ONE**
### **Misrepresentations Regarding Defendants' Service in Violation of Section 5(a)**

64.     In numerous instances, since at least May 2016, in connection with the marketing, promotion, offering for sale, or sale of Defendants' service, Defendants have represented, directly or indirectly, expressly or by implication, that:

A.      Consumers who purchased Defendants' service would have their credit card interest rates permanently reduced to zero percent; and

B.      Consumers who purchased Defendants' service would save thousands of dollars on their credit card debt.

65.     In truth and in fact, in numerous instances in which Defendants have made the representations set forth in Paragraph 64 of this Complaint:

A.      Consumers who purchased Defendants' service do not have their credit card interest rates permanently reduced to zero percent; and

B.      Consumers who purchased Defendants' service do not save thousands

of dollars on their credit card debt.

66. Therefore, Defendants' representations as set forth in Paragraph 64 of this Complaint are false and misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT TWO
### Deceptive Omissions/Failures to Disclose in Violation of Section 5(a)

67. In numerous instances, since at least May 2016, in connection with the marketing, promotion, offering for sale, or sale of Defendants' service, Defendants have represented, directly or indirectly, expressly or by implication, that their service fee is the only cost that consumers will incur to have consumers' credit card interest rates permanently reduced to zero percent.

68. In numerous instances, Defendants have failed to disclose, or failed to disclose adequately to consumers material terms and conditions of their offer, including that Defendants' service may result in a consumer having to pay additional bank or transaction fees, such as balance transfer fees to credit card issuers which can typically total three to five percent of the amount of a consumer's credit card debt.

69. Defendants' failure to disclose, or disclose adequately, the material information as set forth in Paragraph 68 of this Complaint, in light of the representation described in Paragraph 67, above, constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT THREE
### Misrepresentations Regarding Purchasing Defendants' Service in Violation of Section 5(a)

70. In numerous instances, since at least May 2016, in connection with the

15

marketing, promotion, offering for sale, or sale of Defendants' service, Defendants have

represented, directly or indirectly, expressly or by implication, that:

      A.  Consumers have ordered Defendants' service; and

      B.  Consumers owe money to Defendants for Defendants' service.

71.     In truth and in fact, in numerous instances in which Defendants have made the

representations set forth in Paragraph 70 of this Complaint:

      A.     Consumers have not ordered Defendants' service; and

      B.     Consumers do not owe money to Defendants for Defendants' service.

72.     Therefore, Defendants' representations as set forth in Paragraph 70 of this

Complaint are false and misleading and constitute deceptive acts or practices in violation of

Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**COUNT FOUR**
**Unauthorized Consumer Credit Card Applications in Violation of Sections 5(a) and (n)**

73.     In numerous instances, since at least May 2016, Defendants have applied for

one or more credit cards for consumers without the consumers' knowledge, authorization, or

express informed consent.

74.     Defendants' actions cause or are likely to cause substantial injury to

consumers that consumers cannot reasonably avoid themselves and that is not outweighed by

countervailing benefits to consumers or competition.

75.     Defendants' practices as set forth in Paragraph 73 of this Complaint constitute

unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a) and (n).

**THE TELEMARKETING SALES RULE**

76.     Congress directed the FTC to prescribe rules prohibiting abusive and

deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101-6108.  The FTC adopted the original TSR in 1995, and extensively amended it in 2003 and 2010.  The 2010 amendments to the TSR address the telemarketing of debt relief services.  16 C.F.R. Part 310.

77.     Defendants are "seller[s]" or "telemarketer[s]" engaged in "telemarketing" as defined by the TSR, 16 C.F.R. § 310.2(dd), (ff), and (gg).  For purposes of the TSR, a "seller" is any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to a customer in exchange for consideration.  16 C.F.R. § 310.2(dd).  A "telemarketer" is any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor. 16 C.F.R. § 310.2(ff).  And "telemarketing" is a plan, program, or campaign which is conducted to induce the purchase of goods or services or a charitable contribution, by use of one or more telephones and which involves more than one interstate telephone call. 16 C.F.R. § 310.2(gg).

78.     Defendants are sellers or telemarketers of a "debt relief service" as defined by the TSR, 16 C.F.R. § 310.2(o).  Under the TSR, a "debt relief service" is any program or service represented, directly or by implication, to renegotiate, settle, or in any way alter the terms of payment or other terms of the debt between a person and one or more unsecured creditors, including, but not limited to, a reduction in the balance, interest rate, or fees owed by a person to an unsecured creditor or debt collector.  16 C.F.R. § 310.2(o).

79.     The TSR prohibits sellers and telemarketers from misrepresenting, directly or by implication, in the sale of goods or services, any material aspect of any debt relief service.

16 C.F.R. § 310.3(a)(2)(x).

80.     The TSR prohibits sellers and telemarketers from failing to disclose, in a clear and conspicuous manner, before a consumer consents to pay for the goods or services offered, the total costs to purchase, receive, or use any goods or services that are the subject of the sales offer.  16 C.F.R. § 310.3(a)(1)(i).

81.     The TSR prohibits any seller or telemarketer from causing billing information to be submitted for payment, or collecting or attempting to collect payment for goods or services, directly or indirectly, without the customer's express verifiable authorization, except when the method of payment used is a credit card subject to the protections of the Truth In Lending Act, 15 U.S.C. § 1601 *et seq.*, and Regulation Z, 12 C.F.R. § 226, or a debit card subject to the protections of the Electronic Funds Transfer Act, 15 U.S.C. § 1693 *et seq.*, and Regulation E, 12 C.F.R. § 205.  Such authorization shall be deemed verifiable if any of the following means is employed:

    (i)     Express written authorization by the customer, which includes the customer's signature;

    (ii)    Express oral authorization which is audio-recorded and made available upon request to the customer, and which evidences clearly both the customer's authorization of payment for the services that are the subject of the telemarketing transaction and the customer's receipt of all of the following information:

        (A)    An accurate description, clearly and conspicuously stated, of the services for which payment authorization is sought;

(B)     The number of debits, charges, or payments (if more than one);

(C)     The date(s) the debit(s), charge(s), or payment(s) will be submitted for

payment;

(D)     The amount(s) of the debit(s), charge(s), or payment(s);

(E)     The customer's name;

(F)     The customer's billing information, identified with sufficient

specificity such that the customer understands what account will be

used to collect payment for the services that are the subject of the

telemarketing transaction;

(G)     A telephone number for customer inquiry that is answered during

normal business hours; and

(H)     The date of the customer's oral authorization; or

(iii)     Written confirmation of the transaction, identified in a clear and conspicuous

manner as such on the outside of the envelope, sent to the customer via first

class mail prior to the submission for payment of the customer's billing

information, and that includes all of the information contained in

§§310.3(a)(3)(ii)(A)-(G) and a clear and conspicuous statement of the

procedures by which the customer can obtain a refund from the seller

or telemarketer in the event the confirmation is inaccurate.

16 C.F.R. § 310.3(a)(3).

82.     The TSR prohibits sellers and telemarketers from creating or causing to be

created, directly or indirectly, a remotely created payment order as payment for goods or

services offered or sold through telemarketing. 16 C.F.R. § 310.4(a)(9).  A remotely created

payment order includes a remotely created check. 16 C.F.R. § 310.2(cc).

83.     The 2003 amendments to the TSR established the National Do Not Call

Registry, maintained by the FTC, which is a registry of consumers who do not wish to

receive certain types of telemarketing calls.  Consumers can register their telephone numbers

on the Registry without charge either through a toll-free telephone call or over the Internet at

www.donotcall.gov.

84.     The FTC allows sellers, telemarketers, and other permitted organizations to

access the Registry over the Internet at www.telemarketing.donotcall.gov, to pay any

required fee(s), and to download the numbers not to call.

85.     The TSR prohibits sellers and telemarketers from calling any telephone

number within a given area code unless the seller on whose behalf the call is made has paid

the annual fee for access to the telephone numbers within that area code included in the

Registry.  16 C.F.R. § 310.8.

86.     The TSR prohibits sellers and telemarketers from initiating an outbound

telephone call to telephone numbers on the Registry.  16 C.F.R. § 310.4(b)(1)(iii)(B).

87.     The TSR prohibits initiating a telephone call that delivers a prerecorded

message to induce the purchase of any good or service unless the seller has obtained from the

recipient of the call an express agreement, in writing, that evidences the willingness of the

recipient of the call to receive calls that deliver prerecorded messages by or on behalf of a

specific seller.  16 C.F.R. § 310.4(b)(1)(v)(A).

88.     Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and

Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## VIOLATIONS OF THE TELEMARKETING SALES RULE

### COUNT FIVE
**Misrepresenting Material Aspects of a Debt Relief Service - 16 C.F.R. 310.3(a)(2)(x)**

89.     In numerous instances, since at least May 2016, in connection with the telemarketing of a debt relief service, Defendants have misrepresented, directly or by implication, material aspects of a debt relief service, including, but not limited to, that:

A.     Consumers who purchased Defendants' service would have their credit card interest rates permanently reduced to zero percent; and

B.     Consumers who purchased Defendants' service would save thousands of dollars on their credit card debt.

90.     Defendants' acts or practices as set forth in Paragraph 89 of this Complaint are deceptive telemarketing acts or practices that violate the TSR, 16 C.F.R. § 310.3(a)(2)(x).

### COUNT SIX
**Failing to Disclose the Total Cost of the Debt Relief Service - 16 C.F.R. § 310.3(a)(1)(i)**

91.     In numerous instances, since at least May 2016, in connection with the telemarketing of a debt relief service, Defendants have failed to disclose, in a clear and conspicuous manner, before a consumer pays for the goods or services offered, that their service may result in a consumer having to pay additional bank or transaction fees, such as balance transfer fees to credit card issuers which can typically total three to five percent of the amount of a consumer's credit card debt.

21

92.     Defendants' acts or practices as set forth in Paragraph 91 of this Complaint are deceptive telemarketing acts or practices that violate the TSR, 16 C.F.R. § 310.3(a)(1)(i).

## COUNT SEVEN
### Failure to Obtain Express Verifiable Authorization - 16 C.F.R. § 310.3(a)(3)

93.     In numerous instances, since at least May 2016, in connection with the telemarketing of a debt relief service, Defendants have collected or attempted to collect payment for Defendants' service, directly or indirectly, without the consumers' express verifiable authorization.

94.     Defendants' acts or practices as set forth in Paragraph 93 of this Complaint are deceptive telemarketing acts or practices that violate the TSR, 16 C.F.R. § 310.3(a)(3).

## COUNT EIGHT
### Use of Prohibited Payment Method in Telemarketing Sales - 16 C.F.R. § 310.4(a)(9)

95.     In numerous instances, Defendants have created or caused to be created, directly or indirectly, a remotely created check as payment for goods or services offered or sold through telemarketing.

96.     Defendants' acts or practices as set forth in Paragraph 95 of this Complaint are abusive telemarketing acts or practices that violate the TSR, 16 C.F.R. § 310.4(a)(9).

## COUNT NINE
### Violating the National Do Not Call Registry - 16 C.F.R. § 310.4(b)(1)(iii)(B)

97.     In numerous instances, since at least May 2016, in connection with telemarketing, Defendants have engaged in, or caused a telemarketer to engage in, initiating an outbound telephone call to a person's telephone number on the National Do Not Call Registry in violation of the TSR, 16 C.F.R. § 310.4(b)(1)(iii)(B).

## COUNT TEN
### Initiating Unlawful Prerecorded Messages - 16 C.F.R. § 310.4(b)(1)(v)(A)

98.     In numerous instances, since at least May 2016, in connection with telemarketing, Defendants have engaged in, or caused a telemarketer to engage in, initiating outbound telephone calls that deliver prerecorded messages in violation of the TSR, 16 C.F.R. § 310.4(b)(1)(v)(A).

## COUNT ELEVEN
### Failing to Pay National Registry Fees - 16 C.F.R. § 310.8

99.     In numerous instances, since at least May 2016, in connection with telemarketing, Defendants have initiated, or caused others to initiate, an outbound telephone call to a telephone number within a given area code when Defendants had not, either directly or through another person, paid the required annual fee for access to the telephone numbers within that area code that are included in the National Do Not Call Registry, in violation of the TSR, 16 C.F.R. § 310.8.

## CONSUMER INJURY

100.    Consumers have suffered and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act and the TSR.  In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices.  Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

101.    Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC.  The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

102.    Section 19 of the FTC Act, 15 U.S.C. § 57b, and Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b), authorize this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the TSR, including the rescission or reformation of contracts, and the refund of money

## PRAYER FOR RELIEF

Wherefore, Plaintiff FTC, pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b) and 57b, and Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b) and the Court's own equitable powers requests that the Court:

A.    Award Plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief, including but not limited to, temporary and preliminary injunctions, an order freezing assets, and the appointment of a receiver;

B.    Enter a permanent injunction to prevent future violations of the FTC Act and the TSR by Defendants;

C.    Award such relief as the Court finds necessary to redress injury to consumers

resulting from Defendants' violations of the FTC Act and the TSR including, but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies; and

D.      Award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.


Dated:  July 16, 2019                          Respectfully submitted,

                                               ALDEN F. ABBOTT
                                               General Counsel


                                               /s/ *Michael A. Boutros*
                                               **BARBARA E. BOLTON,** Trial Counsel
                                               **MICHAEL A. BOUTROS**
                                               225 Peachtree Street, N.E., Suite 1500
                                               Atlanta, Georgia 30303
                                               (404) 656-1362 (Bolton office)
                                               (202) 650-9806 (Bolton cell)
                                               E-mail: bbolton@ftc.gov
                                               (404) 656-1351 (Boutros office)
                                               (202) 642-7249 (Boutros cell)
                                               Email:   mboutros@ftc.gov
                                               (404) 656-1379 (FTC Fax)


                                               **Attorneys for Plaintiff**
                                               **FEDERAL TRADE COMMISSION**

**CERTIFICATE OF SERVICE**

I hereby certify that, on this date, I electronically filed the foregoing with the Clerk of the Middle District of Florida, Orlando Division, using the CM/ECF system, which will send notice of electronic filing to the service list below.

Robert Eckard
Law Office of Robert Eckard & Associates, P.A.
3110 Alternate U.S. 19 North
Palm Harbor, FL 34683
Robert@RobertEckardLaw.com

Mark Bernet, Receiver
401 E. Jackson St. Suite 1700
Tampa, FL 33602
Mark.bernet@akerman.com

Dated: July 16, 2019                              /s/ *Michael A. Boutros*
                                                  **MICHAEL A. BOUTROS**